## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____  )
                                         )
SLASH CREEK WATERWORKS, INC.             )
57198 Islington Court                    )
Hatteras, NC 27943                       )
                                         )
ANTONIO GIAMBANCO                        )
2323 Middlecoff Court                    )
Titusville, FL 32780                     )
                                         )
TILMAN GRAY d/b/a AVON SEAFOOD           )
40089 Harbor Road                        )
Avon, NC 27915                           )
                                         )
J. RYAN SPECKMAN                         )
2001 Yorkgate Drive                      )
Raleigh, NC 27612                        )
                                         )
STRAWBERRY, INC.                         )
141 Bayview Boulevard                    )
Atlantic Beach, NC 28512                 )
                                         )
          _Plaintiffs_                   )
                                         )
          v.                             )          Civil Action No. 25-cv-2140
                                         )
HOWARD LUTNICK, in his official capacity as )
Secretary of Commerce                    )
U.S. Department of Commerce              )
1401 Constitution Ave NW                 )
Washington, DC 20230                     )
                                         )
NATIONAL MARINE FISHERIES SERVICE        )
Room 14555                               )
1315 East-West Highway                   )
Silver Spring, MD 20910                  )
                                         )
          _Defendants_                   )
                                         )
_____  )


## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1

1.      This case challenges the ongoing lack of accountability for dead discards of red snapper in the South Atlantic Snapper-Grouper fishery, which directly harms commercial fishermen in that region and violates the Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. §§ 1801–1891d ("Magnuson-Stevens Act" or "the Act").

2.      Defendants Howard Lutnick, in his official capacity as Secretary of Commerce, and the National Marine Fisheries Service recently promulgated a final rule implementing Amendment 59 to the Fishery Management Plan for the Snapper-Grouper Fishery of the South Atlantic Region. *See* Snapper-Grouper Fishery of the South Atlantic; Amendment 59, 90 Fed. Reg. 24,527 (June 11, 2025) ("Amendment 59 Final Rule"). The Amendment 59 Final Rule, among other things, sets annual catch limits for red snapper in the South Atlantic region.

3.      The red snapper annual catch limits established in the Amendment 59 Final Rule only serve to limit landings; they do not function in any way to limit or constrain dead discards, which represent the overwhelming majority of catch for South Atlantic red snapper. Relatedly, the Amendment 59 Final Rule also lacks any measures to ensure accountability for dead discards of South Atlantic red snapper. Annual catch limits, with measures to ensure accountability, are required under the Magnuson-Stevens Act.

4.      By consigning dead discards to management outside the annual catch limit system, the Amendment 59 Final Rule also allows a de facto reallocation of red snapper catch away from the commercial sector and toward the recreational sector—which is responsible for virtually all of the dead discards. De facto reallocations also violate the Magnuson-Stevens Act.

5.      Plaintiffs Slash Creek Waterworks, Inc., Antonio Giambanco, Tilman Gray d/b/a Avon Seafood, J. Ryan Speckman, and Strawberry, Inc. are commercial fishing companies, fishermen, fish buyers, and fish processors who are harmed by Defendants' failure to limit and

2

provide accountability for dead discards of red snapper. Plaintiffs hereby challenge the Amendment 59 Final Rule under the Magnuson-Stevens Act and the Administrative Procedure Act, 5 U.S.C. §§ 701–706 ("APA").

6.     Plaintiffs request this Court vacate the Amendment 59 Final Rule and order Defendants to establish and implement revised annual catch limits for South Atlantic red snapper that actually serve to limit dead discards, that include measures to ensure accountability for dead discards, and that reflect the governing allocation ratio between the commercial and recreational sectors.

## JURISDICTION AND VENUE

7.     The Court has jurisdiction over this case pursuant to the Magnuson-Stevens Act, which provides that the "district courts of the United States shall have exclusive jurisdiction over any case or controversy arising under" the Act. 16 U.S.C. § 1861(d).

8.     The Magnuson-Stevens Act provides judicial review of regulations and fishery management actions as follows:

> (1) Regulations promulgated by the Secretary under this Act and actions described in paragraph (2) shall be subject to judicial review to the extent authorized by, and in accordance with, [the APA], if a petition for such review is filed within 30 days after the date on which the regulations are promulgated or the action is published in the Federal Register, as applicable; . . .
> . . .
> (2) The actions referred to in paragraph (1) are actions that are taken by the Secretary under regulations which implement a fishery management plan, including but not limited to actions that establish the date of closure of a fishery to commercial or recreational fishing.

*Id.* § 1855(f).

9. Plaintiffs here challenge the Amendment 59 Final Rule, which was published by the National Marine Fisheries Service in the Federal Register on June 11, 2025. *See* 90 Fed. Reg. 24,527.

10. Plaintiffs are filing this Complaint within 30 days of publication of the Amendment 59 Final Rule in the Federal Register, rendering the challenge timely. *See* 16 U.S.C. § 1855(f)(1); Fed. R. Civ. P. 6.

11. Subject matter jurisdiction is further provided by 28 U.S.C. § 1331, which grants the district courts "original jurisdiction of all civil actions arising under the . . . laws . . . of the United States," as well as 28 U.S.C. § 1361, which grants the district courts "original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."

12. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), (e)(1)(A)–(B), and 5 U.S.C. § 703, because Defendants reside in this judicial district, and because a substantial part of the events or omissions giving rise to the claims occurred in the District of Columbia.

## PARTIES

13. Plaintiff Slash Creek Waterworks, Inc. ("Slash Creek") is a corporation organized under the laws of North Carolina and located in Hatteras, North Carolina. Slash Creek is a commercial fishing business that holds a limited entry South Atlantic Snapper-Grouper permit and fishes for, lands, and sells various snapper-grouper species including red snapper. Current commercial trip limits for red snapper are extremely low, harming Slash Creek by restricting its ability to harvest and sell red snapper. Red snapper yields a relatively high ex-vessel value, so the current restrictions directly harm Slash Creek by reducing its income. Slash Creek reasonably

anticipates—for reasons described further in Paragraphs 18 to 33 below—that if dead discards actually were limited under the annual catch limit (with corresponding measures to ensure accountability), the resulting annual catch limit would be allocated to the sectors and commercial trip limits for red snapper would increase. Increased commercial trip limits would provide increased revenue for Slash Creek and thereby help Slash Creek stay in business, given the myriad other financial and fishing constraints under which it operates.

14.    Plaintiff Antonio Giambanco ("Giambanco") is a commercial fisherman residing in Titusville, Florida. Giambanco owns a commercial fishing vessel with a limited entry Snapper-Grouper fishing permit, and commercially fishes for snapper-grouper species including red snapper in the South Atlantic region. Giambanco lands and sells red snapper, among other species, and a portion of his annual income is from red snapper. Giambanco further buys and sells commercially-caught fish, including red snapper, and earns income from that activity. The current low commercial trip limit for red snapper—which is a consequence of ongoing high levels of dead discards from the recreational sector—harms Giambanco by removing a potentially significant source of income, and forcing him to fish farther north during the summers, away from Florida, where there is less red snapper bycatch. Giambanco reasonably anticipates—for reasons described further in Paragraphs 18 to 33 below—that if dead discards actually were limited under the annual catch limit (with corresponding measures to ensure accountability), the resulting annual catch limit would be allocated to the sectors and commercial trip limits for red snapper would increase. Increased commercial trip limits for red snapper would increase Giambanco's fishing revenue and thereby help him maintain positive net overall, given the numerous financial and fishing constraints under which he operates. It further would

allow him to fish closer to his home throughout the year, and thereby spend more time with his loved ones.

15.     Plaintiff Tilman Gray ("Gray") is an individual doing business as Avon Seafood, a sole proprietorship located in Hatteras, North Carolina. Avon Seafood is a commercial fish buyer, packing house, and wholesaler. In his capacity as proprietor of Avon Seafood, Gray buys and sells South Atlantic snapper-grouper species including red snapper. Because current commercial trip limits for red snapper are extremely low, Gray has access to relatively little red snapper for purchase and sale. Red snapper is a lucrative and highly sought-after fish, so the current restrictions on red snapper directly harm Gray by reducing his income. Gray reasonably anticipates—for reasons described further in Paragraphs 18 to 33 below—that if dead discards actually were limited under the annual catch limit (with corresponding measures to ensure accountability), the resulting annual catch limit would be allocated to the sectors and commercial trip limits for red snapper would increase. Increased commercial trip limits for red snapper would result in more red snapper being available for Gray to purchase and sell, thereby increasing revenue for Gray's business and helping him stay financially viable, given the narrow margins under which he operates.

16.     Plaintiff J. Ryan Speckman ("Speckman") is a seafood buyer, processor, and wholesaler, as well as an owner of retail seafood markets, proprietor of a seafood restaurant, and manager of a Community Supported Fishery. Speckman is based in Raleigh, North Carolina, and buys his products exclusively from fishermen on the North Carolina coast. In the course of his business operations, Speckman buys, processes, sells, and serves South Atlantic red snapper when it is available. Because commercial trip limits for red snapper currently are extremely low—as a result of excessive and unaccountable recreational catch—Speckman has access to

relatively little red snapper for his business operations. Speckman reasonably anticipates—for reasons described further in Paragraphs 18 to 33 below—that if dead discards actually were limited under the annual catch limit (with corresponding measures to ensure accountability), the resulting annual catch limit would be allocated to the sectors and commercial trip limits for red snapper would increase. Increased commercial trip limits for red snapper would result in more red snapper being available for Speckman to purchase, process, and distribute. This in turn would mean increased revenue for Speckman's business operations, which would help him stay economically viable given the relatively small margins under which he operates.

17.     Plaintiff Strawberry, Inc. ( "Strawberry") is a business corporation organized under the laws of North Carolina and located in Atlantic Beach, North Carolina. Strawberry is a commercial fishing business that holds at least one South Atlantic limited entry Snapper-Grouper permit. Strawberry was established in 1992, and since then has been an active permit-holder and participant in the South Atlantic Snapper-Grouper fishery. Red snapper is one of the species available for harvest under the permits held by Strawberry; Strawberry accordingly earns a portion of its annual revenue from red snapper. The current low commercial trip limit for red snapper—which is a consequence of ongoing high levels of dead discards from the recreational sector—harms Strawberry by restricting its ability to harvest and sell available red snapper. Strawberry reasonably anticipates—for reasons described further in Paragraphs 18 to 33 below— that if dead discards actually were limited under the annual catch limit (with corresponding measures to ensure accountability), the resulting annual catch limit would be allocated to the sectors and commercial trip limits for red snapper would increase. Increased commercial trip limits for red snapper would provide increased revenue for Strawberry and thereby help

Strawberry stay in business, given the myriad other financial and fishing constraints under which it operates.

18.    To understand specifically why Plaintiffs anticipate a benefit from a successful outcome in this case, it is necessary to understand some basic facts about the fishery and the management system.

19.    Red snapper is part of a mixed-species assemblage that is subject to recreational fishing throughout the year. Individual species within the assemblage may be "closed" to recreational fishing for certain periods of time, but that just means anglers cannot retain the species and instead must discard it. Because there is virtually always a species in the bottomfish assemblage that is "open" and can be kept, people go recreational bottomfishing year-round.

20.    When people go recreational bottomfishing in the South Atlantic, they frequently end up catching and bringing up red snapper. This is true whether or not the fisher intends to target red snapper; even when targeting a different species, red snapper are often caught because they co-occur with the other targeted species.

21.    Most of these recreationally caught red snapper are discarded, because the South Atlantic red snapper season is only "open" for a few days each year. And some percentage of the discarded red snapper end up dying—from poor handling practices, barotrauma, shark predation, or other reasons.

22.    This catch-and-discard cycle happens at a massive scale in the recreational fishery. In the South Atlantic, the recreational fishery is open access and constantly growing. There are millions of hooks going in the water, millions of red snapper being caught, and millions of red snapper being discarded. Even though only a subset of discarded fish end up

dying, the high overall level of recreational fishing effort means that a tremendous number of South Atlantic red snapper are removed from the population as dead discards each year.

23.    The Amendment 59 Final Rule, like previous regulations governing the South Atlantic red snapper stock, only provides a limit—and accountability measures to that limit—for landings of red snapper.  Dead discards are not managed within the annual catch limit mechanism.

24.    Because dead discards are not limited and have no accountability, they simply increase as recreational fishing effort increases.  And recreational fishing effort has increased substantially in recent decades, due to the open-access nature of the fishery, combined with increased participation and sharp increases in fishing power (from the use of GPS, stationary idling technology, fish finders, more powerful boats, etc.).

25.    With ever-increasing recreational dead discards of red snapper, Defendants have attempted to avoid overfishing by ratcheting down the level of landings of red snapper that are allowed.  Landings and dead discards both represent fish removed from the population, and as such they both contribute to overfishing. Because "a dead fish is a dead fish," landings and dead discards can be traded against each other in terms of avoiding overfishing. Thus as dead discards from the recreational sector have increased, Defendants have cut the allowable *landings* from both the recreational sector and the commercial sector, in their effort to balance the books and avoid overfishing of red snapper. (These efforts to avoid overfishing have generally been unsuccessful to date, but that is not the subject of this lawsuit.)

26.    So as provided in the Amendment 59 Final Rule, commercial landings of South Atlantic red snapper are limited to extremely low levels, yet the reason commercial landings are

throttled back so hard is because of a problem originating in the *recreational* sector. That problem is uncontrolled, and unaccountable, dead discards.

27.    Commercial fishermen in the South Atlantic in this way are "paying the bill" for the recreational sector: they have watched their own landings get cut, year after year, because of the recreational sector's unaccountable and uncontrolled dead discards.

28.    The Amendment 59 Final Rule continues Defendants' illegal practice of allowing unlimited and unaccountable dead discards of South Atlantic red snapper, and restricting allowable landings in an attempt to compensate for the dead discards. Indeed, Defendants cite the high levels of ongoing recreational dead discards as the reason for the even-lower-than-before level of landings that are permitted by the Amendment 59 Final Rule.

29.    If Defendants actually provided a functional limit for dead discards of South Atlantic red snapper, and measures to ensure accountability with that limit, Plaintiffs and other commercial fishermen would no longer be in the position of "paying the bills" for the recreational sector. Instead, a limit on total catch would be set, and divided between the commercial and recreational sectors according to an allocation ratio. Then each sector would be responsible for staying within its own limits. If a sector were to exceed its limits, it (and only it) would be held accountable.

30.    Annual catch limits with measures to ensure accountability are required by the Magnuson-Stevens Act for all catch, not just landings. And direct acknowledgment of allocations—not de facto reallocations via uncounted dead discards—also is required by the Magnuson-Stevens Act. Those principles are what this lawsuit seeks to vindicate.

31.    An actual annual catch limit for red snapper with measures to ensure accountability would benefit Plaintiffs as well as other commercial fishermen because as

explained above, they would no longer have to "pay the bills" for the recreational sector's dead

discard problem. In other words, a successful outcome in this case would result in Plaintiffs'

landings no longer being throttled back continuously due to ballooning recreational dead

discards.

32.     Furthermore, if NMFS were to comply with the law and establish an annual catch

limit for South Atlantic red snapper that governs all catch—not just landings—Plaintiffs

reasonably believe that the commercial sector would end up with a substantially higher level of

access to red snapper than is currently the case. At present, the commercial sector only represents

around 5% of total red snapper catch, due to the massive amount of recreational dead discards.

Under the governing allocation ratio, the commercial sector should receive 28% of red snapper.

If all catch were included under the annual catch limit, and that annual catch limit were then

allocated out to the two sectors, it is not difficult to conclude that commercial fishermen such as

Plaintiffs would see an increase in their share.

33.     Thus with a successful outcome in this lawsuit, Plaintiffs would no longer see

their trip limits ratcheted down due to recreational dead discards, and it is highly likely that they

would receive increased opportunities to harvest, buy, process, and sell more red snapper. This

would allow Plaintiffs and other commercial fishermen to earn more revenue through their fish-

related operations. And such an increase in revenue would be a lifeline for Plaintiffs and other

commercial fishermen. Commercial fishing in the South Atlantic region is barely a viable

enterprise at present, and many operations get by on extremely low net revenue. Increased red

snapper trip limits would help commercial fishermen, buyers, and processors to invest in

infrastructure and maintenance, instead of deferring these things and ending up in an increasingly

marginal economic existence.

34.     Defendant Howard Lutnick ("Lutnick"), the United States Secretary of Commerce, is the highest-ranking official within the Department of Commerce and, in that capacity, has formal responsibility for the administration and implementation of the Magnuson-Stevens Act, as well as for compliance with all other federal laws applicable to the Department of Commerce. Lutnick, through his designee National Marine Fisheries Service, as described below, took the challenged action in this lawsuit by approving Amendment 59 and promulgating the Amendment 59 Final Rule. He is sued in his  official capacity.

35.     Defendant National Marine Fisheries Service ("NMFS") is a federal agency within the Department of Commerce, with the responsibility of protecting and managing the fish, marine mammals, and other marine resources of the United States. NMFS has been delegated authority by the Secretary of Commerce to implement and enforce the Magnuson-Stevens Act, including approving fishery management plans and amendments to those plans, and promulgating implementing regulations. NMFS is the government agency primarily responsible for ensuring that the requirements of the Magnuson-Stevens Act are followed and enforced, including the requirement to set annual catch limits with measures to ensure accountability, and the requirements relating to allocations. NMFS took the challenged action in this lawsuit by approving Amendment 59 and promulgating the Amendment 59 Final Rule.

## LEGAL BACKGROUND

**The Magnuson-Stevens Fishery Conservation and Management Act**

36.     Congress enacted the Magnuson-Stevens Act in 1976, in order "to conserve and manage the fishery resources found off the coasts of the United States." 16 U.S.C. § 1801(b)(1).

37.     The Act establishes eight Regional Fishery Management Councils, including the South Atlantic Fishery Management Council, which manages fisheries in federal waters off North Carolina, South Carolina, Georgia, and the east coast of Florida. *Id.* § 1852(a)(1)(C).

38.     Councils are tasked with preparing fishery management plans and amendments for each fishery within their geographic areas of authority, *id.* § 1852(h)(1), as well as recommending regulations to implement such plans and amendments, *id.* § 1853(c).

39.     The Secretary of Commerce, acting through NMFS, reviews all submitted plans, plan amendments, and regulations, *id.* § 1854(a)–(b), and upon approval, promulgates regulations and otherwise implements the plans and plan amendments, *id.* §§ 1854(b)(3), 1855(d).

40.     The Act requires that all fishery management plans, plan amendments, and implementing regulations be consistent with ten "National Standards" for fishery conservation and management. *Id.* § 1851(a).

41.     National Standard 1 requires that "[c]onservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery . . . ." *Id.* § 1851(a)(1). Optimum yield in turn is defined by the Act as the amount of fish that "is prescribed on the basis of the maximum sustainable yield from the fishery, as reduced by any relevant social, economic, or ecological factor," and "in the case of an overfished fishery, provides for rebuilding to a level consistent with producing the maximum sustainable yield in such fishery." *Id.* § 1802(33)(C).

42.     The Act defines the terms "overfishing" and "overfished" to mean "a rate or level of fishing mortality that jeopardizes the capacity of a fishery to produce the maximum sustainable yield on a continuing basis." *Id.* § 1802(34). Regulatory guidelines promulgated by

NMFS clarify that "overfishing" refers to the rate of removals from a fish stock (i.e., the act of fishing at an unsustainable rate), whereas "overfished" refers to when a stock's biomass or reproductive potential is below a level at which it can produce maximum sustainable yield on a continuing basis (i.e., the state of being depleted). *See* 50 C.F.R. § 600.310(e)(2)(i).

43.    National Standard 4 provides that "If it becomes necessary to allocate or assign fishing privileges among various United States fishermen, such allocation shall be (A) fair and equitable to all such fishermen; (B) reasonably calculated to promote conservation; and (C) carried out in such manner that no particular individual, corporation, or other entity acquires an excessive share of such privileges." 16 U.S.C. § 1851(a)(4). NMFS has interpreted National Standard 4, through regulatory guidelines, as requiring an analysis of how each allocative action relates to fishery management objectives, and how it satisfies the statutory criteria of being fair and equitable, and reasonably calculated to promote conservation. *See* 50 C.F.R. § 600.325(c)(2). Allocations of rebuilding stocks furthermore must distribute the benefits and burdens of rebuilding evenly among participants in the fishery. *See id.* § 600.325(c)(3)(ii); *see also* 16 U.S.C. § 1854(e)(4)(B) (same).

44.    Other National Standards address science, coordination, efficiency, contingency planning, costs, fishing communities, bycatch, and safety of human life at sea. *Id.* § 1851(a)(2)– (10).

45.    In addition to the National Standards, the Magnuson-Stevens Act provides direct requirements for fishery management plans. One such requirement is to "specify objective and measurable criteria for identifying when the fishery to which the plan applies is overfished (with an analysis of how the criteria were determined and the relationship of the criteria to the reproductive potential of stocks of fish in that fishery), and, in the case of a fishery which the

Council or the Secretary has determined is approaching an overfished condition or is overfished, contain conservation and management measures to prevent overfishing or end overfishing and rebuild the fishery." *Id.* § 1853(a)(10).

46.    Other direct fishery management plan requirements include assessing and specifying maximum sustainable yield and optimum yield, *id.* § 1853(a)(3), examining data needs and data collection requirements, *id.* § 1853(a)(5), and identifying essential fish habitat, *id.* § 1853(a), among other things.

**The Magnuson-Stevens Reauthorization Act of 2006**

47.    At the turn of the 21st Century, nearly thirty years into federal management, overfishing was still a problem in many fisheries. Even after Congress strengthened the Magnuson-Stevens Act's sustainability requirements in 1996—adding measures like mandatory rebuilding plans and habitat protection—NMFS and the Councils continued to struggle with ending overfishing.

48.    Congress responded in 2006, amending the Act to add a new requirement that fundamentally changed federal fisheries management: annual catch limits. All fishery management plans going forward must "establish a mechanism for specifying annual catch limits . . . at a level such that overfishing does not occur in the fishery, including measures to ensure accountability." Pub. L. No. 109–479, § 104(a)(10), 120 Stat. 3575, 3584 (Jan. 12, 2007), *codified at* 16 U.S.C. § 1853(a)(15).

49.    Annual catch limits are numerical limits on the allowable catch for each fish stock, set every year at a level below the overfishing threshold. The idea is to set a science-based limit on allowable catch ahead of time, and stay accountable to that limit. This represented a

radical change for many fisheries, which for decades had been managed with no meaningful accountability.

50.    Congress made its intent clear in 2006 that annual catch limits should be treated as actual limits—meaning caps that are not to be exceeded. *See, e.g.*, 151 Cong. Rec. S12840, S12850 (daily ed. Nov. 15, 2005) (statement of Sen. Ted Stevens) ("[T]his bill mandates the use of annual catch limits which shall not be exceeded."); S. Rep. No. 109–229, at 7 (2006) (describing annual catch limit requirement as "scientifically established annual catch limits be[ing] set and adhered to in each managed fishery"); *id.* at 21 ("The Committee expects that if a sector is likely to exceed its annual catch limit, the Council will restrict that sector's harvest to ensure the sector stays within its annual catch limit."); *accord* Magnuson-Stevens Act Provisions; Annual Catch Limits; National Standard Guidelines, 74 Fed. Reg. 3178, 3183 (Jan. 16, 2009) ("NMFS decided, that since Congress called for annual catch limits to be set, that the ACL should be considered a true limit—a level not to be exceeded.").

51.    The annual catch limit requirement, and the accountability it created, was intended to finally operationalize the Act's long-standing mandate to prevent overfishing. This was stated directly in the text of the Act, which requires annual catch limits to be set "at a level such that overfishing does not occur, 16 U.S.C. § 1853(a)(15), and is underscored by the legislative history, *see, e.g.*, S. Rep. No. 109–229, at 6-7 (2006) (pointing out that "overfishing is still occurring in a number of fisheries, even those fisheries under a rebuilding plan," and stating "[t]he Committee intends that these annual catch limits, taken with the existing overfishing and rebuilding authorities, will ensure full compliance with the Magnuson-Stevens Act"). *Accord* 50 C.F.R. § 600.310(f)(4)(i) (NMFS reiterating in regulatory guidelines that annual catch limits "must prevent overfishing" when measured against a stock's status determination criteria).

52.     Congress furthermore did not exempt any fisheries or sectors from the annual catch limit mandate. "Catch," as used in the annual catch limit requirement, means all fish killed by fishing activity, whether the fishing is recreational or commercial in nature, and whether the fish are retained or discarded. *See, e.g.*, S. Rep. No. 109–229, at 23–24 (2006) ("Catch of all species, whether targeted or taken as bycatch, whether retained or discarded, count toward the annual catch limits, and fisheries are closed when these limits are reached."); *accord* 50 C.F.R. § 600.310(f)(1)(i) (NMFS regulatory guidelines defining catch as "the total quantity of fish, measured in weight or numbers of fish, taken in commercial, recreational, subsistence, tribal, and other fisheries," and specifying that "[c]atch includes fish that are retained for any purpose, as well as mortality of fish that are discarded.").

53.     After 2006, overfishing rates across U.S. fisheries dropped significantly under the new annual catch limits mandate. As one court subsequently observed, the new legal mandate "fundamentally altered American fishing regulation by requiring [managers] to set hard, science-based caps on how many fish could be caught each year and by demanding that accountability measures be triggered when fishermen exceeded those caps." *Conservation Law Found. v. Pritzker*, 37 F. Supp. 3d 254, 266 (D.D.C. 2014) (citations omitted).

**The Modernizing Recreational Fisheries Management Act of 2018**

54.     Recreational saltwater fishing has been growing steadily in popularity in the United States. In 2020, recreational anglers took nearly 200 million fishing trips nationwide. *See* NOAA Fisheries, 2020 Fisheries of the United States, at 12 (2022). In many fisheries, particularly in the South Atlantic, Mid-Atlantic, and Gulf of Mexico regions, recreational catch now equals or exceeds commercial catch.

55.     In recognition of the rapid expansion of recreational fishing, Congress passed the Modernizing Recreational Fisheries Management Act of 2018, Pub. L. No. 115–405, 132 Stat. 5355. This legislation amended the Magnuson-Stevens Act to clarify that that recreational fisheries are indeed subject to annual catch limits—in response to arguments from recreational fishing lobbyists that they should be exempt from catch limits. In the 2018 legislation, Congress noted management options that exist for recreational fisheries, including the use of extraction rates or fishing mortality targets, but specifically stated that such options are to be used "in addition to" annual catch limits. Pub. L. No. 115–405, § 102(a)(3), 132 Stat. 5355, 5357 (codified at 16 U.S.C. § 1852(h)(8)). Congress further clarified in a rule of construction that "[n]othing in [the 2018 legislation] shall be construed as modifying the requirements of" the annual catch limit requirement, and noted the "equal application of such requirement[]" to all fishery sectors. *Id.* § 301, 132 Stat. at 5360–61 (codified as amended at 16 U.S.C. § 1801 note).

**The Administrative Procedure Act**

56.     The APA sets forth basic process requirements for federal rulemaking, including public notice and opportunity to comment on a proposed rule and required timelines for making a final rule effective. *See* 5 U.S.C. § 553. It also provides a cause of action in judicial review for "[any] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action." *Id.* § 702.

57.     In judicial review under the APA, a court must "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A). Courts also must set aside any agency action that is taken "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id.*

§ 706(2)(C). The APA further states that courts shall "compel agency action unlawfully withheld or unreasonably delayed." *Id.* § 706(1).

58.     An agency action is arbitrary and capricious under the APA "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## FACTUAL BACKGROUND

### Red Snapper and the Early Snapper-Grouper Fishery

59.     Red snapper (*Lutjanus campechanus*) is a highly valued marine fish whose primary distribution in U.S. waters extends from the Gulf of Mexico to Cape Hatteras, North Carolina. Red snapper live on the continental shelf, with juveniles inhabiting shallow nearshore waters and adults occupying deeper waters generally in the 60-300 foot depth range. Adults tend to live in areas with structured bottom habitat such as rocky reefs, though they also may be found over sandy or muddy bottom areas at times. Red snapper can live for over fifty years, and grow to a size of 40 inches and 50 pounds. Females reach reproductive maturity between 1 and 3 years of age, but reproductive output increases with age such that older adults are significantly more productive than younger ones.

60.     People have fished for snappers and groupers for centuries, in the area now known as the U.S. Southeast. The first commercial landings recorded were in 1880; through the remainder of the 1800s and the first few decades of the 1900s, commercial landings stayed at

relatively modest levels. By the 1950s, however, vessel power and navigational systems had improved, and commercial fishing capacity for snappers and groupers increased substantially. *See generally* South Atlantic Fishery Management Council, Fishery Management Plan, Regulatory Impact Review, and Final Environmental Impact Statement for the Snapper-Grouper Fishery of the South Atlantic Region, at 29-32 (Mar. 1983) ("Snapper-Grouper FMP").

61.    From 1950 through 1980, South Atlantic red snapper commercial landings were in the range of 300,000-500,000 pounds per year. The recreational fishery for snappers and groupers ramped up during this same time period, as the tourism economy in the Southeast took off, and by the 1970s and 1980s recreational anglers were catching as much or more red snapper as the commercial sector. *See* Southeast Data, Assessment, and Review, SEDAR 73: South Atlantic Red Snapper Stock Assessment Report, Section II at 47 (2021) ("SEDAR 73") (Table 3).

**The Snapper-Grouper FMP and Initial Amendments**

62.    Federal management of red snapper began in 1983, when the South Atlantic Council adopted the original Snapper-Grouper Fishery Management Plan (FMP). Under the FMP, red snapper are managed along with fifty-odd other species of snappers, groupers, basses, porgies, grunts, tilefishes, triggerfishes, wrasses, and jacks that inhabit federal waters in the South Atlantic region. *See generally* Snapper-Grouper FMP, at 1-7.

63.    By the time the Snapper-Grouper FMP was adopted, red snapper was already understood to be subject to overfishing (i.e., the rate of fishing was unsustainably high). *See id.* at vii-viii. The FMP provided a minimum size limit for red snapper of 12 inches, in an attempt to reduce mortality rates for the stock. *Id.* at viii.

64.     High red snapper landings continued through the 1980s, however, and the stock

declined to a low abundance by 1990. *See* SEDAR 73, Section II at 100 (Figure 14). NMFS and

the South Atlantic Council introduced a handful of further management measures for red snapper

in 1991, including an increased size limit, bag limits, and certain gear prohibitions, and

established a rebuilding time period of 15 years, intended to restore the stock to healthy levels by

2006. *See* South Atlantic Fishery Management Council, Final Amendment Number 4,

Regulatory Impact Review, Initial Regulatory Flexibility Analysis and Environmental

Assessment (Apr. 1991).

65.     Population analyses during the 1990s confirmed that red snapper continued to be

subject to overfishing. *See* SEDAR 73, Section I at 29. South Atlantic red snapper accordingly

was listed as "overfished" in NMFS's first Status of Stocks Report. *See* National Marine

Fisheries Service, Status of Fisheries of the United States: Report to Congress (Sept. 1997).

66.     New management measures were introduced in the late 1990s, including an

aggregate bag limit, limited entry commercial permits, and a commercial capacity reduction

program—which required (and still requires today) a 2-for-1 exchange of permits any time a

permit transfer is made. *See* South Atlantic Fishery Management Council, Final Amendment 8 to

the Fishery Management Plan for the Snapper Grouper Fishery of the South Atlantic Region

(July 1997).

**Amendment 17A:  Prohibition on Red Snapper Landings**

67.     In 2008, after the stock's rebuilding deadline had come and gone, NMFS

conducted a new stock assessment of South Atlantic red snapper and found once again that the

stock was subject to overfishing (i.e., fish were being removed from the population too rapidly)

and the stock was overfished (i.e., the population size was too small). *See* Southeast Data,

Assessment, and Review, SEDAR 15 Stock Assessment Report 1 (SAR 1): South Atlantic Red Snapper, Section I at 12 (Mar. 2009). The new assessment noted that "[t]he bulk of landings of red snapper come from the recreational fishery, which have exceeded the landings of the commercial fishery by 2-3 fold over the assessment period," and also that the existing 12-inch size limit was "believed to have caused an increase in discarding." *Id.*

68.    NMFS and the South Atlantic Council responded to the new stock assessment in 2010, via Amendment 17A to the Snapper-Grouper FMP. Amendment 17A established a prohibition on possessing or landing red snapper in the South Atlantic region, provided certain gear requirements for hook and line fishing, and set an area closure for all snapper-grouper fishing that was intended to reduce dead discards of red snapper. Amendment 17A also provided a new rebuilding timeframe for red snapper of 35 years, which meant the stock would be rebuilt by the year 2044. *See* South Atlantic Fishery Management Council, Amendment 17A to the Fishery Management Plan for the Snapper Grouper Fishery of the South Atlantic Region, at S-1 to S-20 (July 2010); *see also* 75 Fed. Reg. 49,447 (Aug. 13, 2010) (proposed rule); 75 Fed. Reg. 76,874 (Dec. 9, 2010) (final rule).

69.    Shortly after Amendment 17A was finalized at the Council level, a new stock assessment for red snapper was released. The new assessment again found red snapper to be subject to overfishing (i.e., the fishing mortality rate was too high), and overfished (i.e., the remaining population was too small). *See* Southeast Data, Assessment, and Review, SEDAR 24 Stock Assessment Report: South Atlantic Red Snapper, Section I at 8 (Oct. 2010). The assessment noted that "[r]ecreational fleets dominate the total [fishing mortality]" for red snapper, *id.* at 11, and found that dead discards had comprised a significant portion of total red snapper catch in recent years, *id.* at 15.

70.     Despite the 2010 stock assessment finding red snapper once again overfished and subject to overfishing, NMFS and the Council decided to postpone and subsequently remove the area closure provided in Amendment 17A, such that it never actually took effect. *See* National Marine Fisheries Service, Emergency Rule To Delay Effectiveness of the Snapper-Grouper Area Closure, 75 Fed. Reg. 76,890 (Dec. 9, 2010); National Marine Fisheries Service, Red Snapper Management Measures, 76 Fed. Reg. 23,728 (Apr. 28, 2011). The agency reasoned that "the rate of overfishing found in SEDAR 24 [the newer stock assessment] is less than the rate of overfishing found in the previous SEDAR 15 stock assessment," so the area closure no longer was necessary. *Id.* at 23,729.

**Resuming Red Snapper Landings Under Amendment 28**

71.     In 2012, the Council and NMFS revised snapper-grouper management to allow directed fishing for red snapper again. Under the new approach, formalized in Amendment 28, red snapper landings would be allowed if the total catch (landings plus dead discards) in the prior year did not exceed a certain level. *See* National Marine Fisheries Service, Temporary Rule To Establish Management Measures for the Limited Harvest and Possession of South Atlantic Red Snapper in 2012, 77 Fed. Reg. 51,939 (Aug. 28, 2012); Amendment 28 to the Fishery Management Plan for the Snapper Grouper Fishery of the South Atlantic Region (Jan. 2013); 78 Fed. Reg. 25,047 (Apr. 29, 2013) (proposed rule); 78 Fed. Reg. 44,461 (July 24, 2013) (final rule).

72.     Also in 2012, NMFS and the South Atlantic Council established a formal allocation for red snapper, setting a ratio of 28.07 percent commercial to 71.93 percent recreational, which would be applied going forward. *See* South Atlantic Fishery Management Council, Amendment 25 to the Fishery Management Plan for the Snapper Grouper Fishery of the

South Atlantic Region, at 53 (Oct. 2011); 76 Fed. Reg. 74,757, 74,760 (Dec. 1, 2011) (proposed rule); 77 Fed. Reg. 15,916, 15,924 (Mar. 16, 2012) (final rule).

73.     Using the Amendment 28 approach and the new allocation ratio, NMFS allowed landing of red snapper in 2012, 2013, and 2014. *See id.* at 51,939 (2012 season); 78 Fed. Reg. at 44,461 (2013 season contained in Amendment 28 package); 79 Fed. Reg. at 32,496 (2014 season).

74.     In 2015, however, landing and possessing red snapper was prohibited. Under the terms of Amendment 28, landings were not allowed in 2015 because in the preceding year, total catch (landings plus dead discards) had exceeded the relevant limit. *See* 82 Fed. Reg. 50,839, 50,839. This occurred again in 2016, which was remarkable because no open season had been allowed; it meant that the steadily increasing level of dead discards had exceeded the limit on its own, with no appreciable contribution from landed catch. *See id.* And again in 2017, the same result occurred—until NMFS and the Council changed the rules.

**Amendment 43:  Sweeping Dead Discards Under the Rug**

75.     By 2017, a new stock assessment had been released, and once again red snapper was found to be subject to overfishing (i.e., the rate of removals was too high) as well as overfished (i.e., the population remaining was too small). *Id.* at 50,839–40. NMFS acknowledged that the stock assessment showed "the majority of the estimated fishing mortality [for red snapper] occurred from estimated dead discards." *Id.* at 50,840; *see also* Southeast Data, Assessment, and Review, SEDAR 41 Stock Assessment Report – Revision 1: South Atlantic Red Snapper, Section VII (Apr. 2017). NMFS determined the stock assessment represented the best available science, and published a Federal Register notice confirming that South Atlantic red

snapper had yet again been found to be subject to overfishing and overfished. *See* 82 Fed. Reg. 18,434 (Apr. 19, 2017).

76.     Because the new stock assessment showed a modest uptick in red snapper biomass, however, NMFS declared that "sufficient steps had been taken to address overfishing." 82 Fed. Reg. at 50,840. The agency furthermore "determined that allowing limited harvest of red snapper in 2017 is not likely to result in overfishing." *Id.* Based on these statements, the Council recommended and NMFS approved Amendment 43, which removed the previous system (established under Amendment 28) for setting the amount of annual landings for red snapper, and replaced it with a flat recurring amount of landings. *See* South Atlantic Fishery Management Council, Amendment 43 to the Fishery Management Plan for the Snapper Grouper Fishery of the South Atlantic Region (Nov. 20, 2017); 83 Fed. Reg. 22,938 (May 17, 2018) (proposed rule); 83 Fed. Reg. 35,428 (July 26, 2018) (final rule).

77.     At the same time as it set an annual catch limit in terms of landings only, NMFS also acknowledged that there was a large amount of ongoing discard mortality for red snapper. *See, e.g.*, 82 Fed. Reg. 1720, 1720 (Jan. 6, 2017) (notice of intent to prepare EIS for Amendment 43) ("Discard mortality, particularly from the recreational sector, continues to be a significant source of overall mortality for red snapper."); 83 Fed. Reg. at 22,939 ("[M]ost of the catch is now discarded . . . ."); 83 Fed. Reg. at 35,428 ("[A] large majority of the estimated fishing mortality was attributed to very large and uncertain dead discard estimates . . . ."); Amendment 43, at D-1 ("Since 2010, estimates of dead discards have accounted for most of the total removals (92%), likely a result of incidental catch of red snapper while fishermen targeted co-occurring species.").

78.     NMFS nevertheless removed the only portion of the management system that had accounted for dead discards of red snapper. Under Amendment 28, while dead discards were not explicitly limited, they were at least minimally taken into account because if total catch (dead discards plus landings) exceeded a certain level, allowable landings would be set at zero for the following year. Amendment 43 removed this provision, leaving dead discards entirely out of the annual catch limit mechanism for red snapper. *See* 83 Fed. Reg. at 22,940; 83 Fed. Reg. at 35,435 (eliminating regulatory language at 50 C.F.R. § 622.193(y)).

79.     NMFS and the Council originally described Amendment 43 as a package that also would include management measures—outside the annual catch limit mechanism—to deal with dead discards. *See* 82 Fed. Reg. at 1720 (notice of intent to prepare EIS) ("[T]he Council is considering methods to reduce discard mortality in Amendment 43 including spatial and temporal closures . . . changes to allowable fishing gear types (e.g., circle hooks), and requiring the use of descending devices and/or venting tools for released fish.").

80.     NMFS and the Council dropped such measures from the scope of Amendment 43, however, deferring them to some undefined point in the future. *See* 82 Fed. Reg. 37,441 (Aug. 10, 2017) (revised notice of intent to prepare EA) ("[T]he Council decided to reduce the scope of actions considered in Amendment 43. . . . The Council may consider [] other actions . . . in a future amendment.").

81.     In the course of removing dead discards entirely from the annual catch limits mechanism, NMFS maintained that "allocations [we]re outside the scope" of Amendment 43, *see* 83 Fed. Reg. at 35,423, despite the vast majority of dead discards coming from the recreational sector, at the expense of the commercial sector.

82.    NMFS implemented Amendment 43 in 2019, 2020, and 2021, setting directed fishing seasons for both recreational and commercial sectors. *See* 84 Fed. Reg. 7827 (Mar. 5, 2019); 85 Fed. Reg. 36,165 (June 15, 2020); 86 Fed. Reg. 30,393 (June 8, 2021).

**SEDAR 73: Continued Overfishing Due to Excessive Dead Discards**

83.    In 2021, a new stock assessment was completed for South Atlantic red snapper. In that assessment, called SEDAR 73, scientists once again found red snapper to be subject to overfishing (i.e., fish were being killed to rapidly) and overfished (i.e., the spawning stock biomass was too low). *See* Southeast Data, Assessment, and Review, SEDAR 73, South Atlantic Red Snapper: Stock Assessment Report, Section II at 10 (Mar. 2021). SEDAR 73 was reviewed and approved for use in management by the South Atlantic Council's Scientific and Statistical Committee, and was designated by NMFS as the best available scientific information.

84.    The new stock assessment again found that overfishing was being driven by recreational dead discards. *See* SEDAR 73, Section II at 10 (noting progress toward rebuilding spawning stock biomass, but that "the primary driver of overfishing is recreational discards"); *id.* at 113 (Figure 27 showing relative contributions to fishing mortality on red snapper); *id.* at 64, 66 (Tables 20 and 22 reflecting that in the terminal years of the assessment (2017–2019), an average of 85% of catch by weight came from dead discards).

85.    Based on SEDAR 73, NMFS sent a letter to the South Atlantic Council, notifying the Council as required by 16 U.S.C. § 1854(e)(2) that the red snapper stock had been determined to be subject to overfishing and overfished. *See* Letter from Andrew J. Strelcheck, Acting Regional Administrator, National Marine Fisheries Service, to Mel Bell, Chair, South Atlantic Fishery Management Council (July 23, 2021). In the agency's notification letter, it acknowledged "the Magnuson-Stevens [] Act requires the Council and [NMFS] to implement a

plan amendment and regulations to end overfishing immediately and rebuild the affected stock."
*Id.* at 2. NMFS also published in the Federal Register a notice stating that South Atlantic red
snapper had been determined to be "both subject to overfishing and overfished." 86 Fed. Reg.
41,022, 41,023 (July 30, 2021). That notice further stated that NMFS had "notified the South
Atlantic Fishery Management Council of the requirement to end overfishing and to rebuild these
stocks." *Id.*

**Four Years of Inaction from the Council and NMFS**

86.     The South Atlantic Council initiated a fishery management plan amendment in
2021, designated as Regulatory Amendment 35, to respond to the red snapper overfishing
determination. *See* South Atlantic Fishery Management Council, DRAFT Regulatory
Amendment 35: Red snapper catch limits and recreational gear modifications for the snapper
grouper fishery (Mar. 2023). The contents of Regulatory Amendment 35 varied as it took shape,
and at different stages included consideration of gear modifications, time/area closures, and
angler outreach, among other things. These measures were aimed at reducing recreational dead
discards, which comprise the majority of overall red snapper fishing mortality, and thereby
ending overfishing on the stock. Regulatory Amendment 35 also included a modest change to the
amount of annual landings being allowed for red snapper, even though landings represent a small
component of overall fishing mortality on the stock. *Id.*

87.     After nearly two years of discussion, the Council winnowed down the
management measures in Regulatory Amendment 35 to simply a one-hook requirement for the
recreational sector, and angler outreach on best practices for reducing dead discards. *See id.* The
Council's scientific advisers and NMFS clearly stated that the one-hook requirement and angler
outreach would not be sufficient to end overfishing, but nevertheless the Council approved

Regulatory Amendment 35 in March 2023, clearing it for transmittal to NMFS for review and implementation. *See* South Atlantic Fishery Management Council, Snapper Grouper Regulatory Amendment 35, https://safmc.net/amendments/snapper-grouper-regulatory-amendment-35.

88.    Regulatory Amendment 35 never actually was processed by NMFS, however, as the Council at its December 2023 meeting rescinded its approval, bringing the management action back within the purview of the Council. *See id.* No further actions were taken on Regulatory Amendment 35, nor any other action to reduce or constrain dead discards for South Atlantic red snapper. *See* 90 Fed. Reg. at 24,528.

89.    While this Council process was happening, NMFS continued with status quo management of red snapper, setting directed fishing seasons for 2022 and 2023. *See* 87 Fed. Reg. 31,190 (May 23, 2022); 88 Fed. Reg. 33,838 (May 25, 2023). With minor differences, NMFS again provided directed fishing seasons for 2024. *See* 89 Fed. Reg. 50,530 (June 14, 2024).

**Amendment 59: Continuing the Same Failed Approach**

90.    In 2025, NMFS issued a secretarial amendment to the Snapper-Grouper Fishery Management Plan, which made minor changes to the red snapper annual catch limit. The action was titled Amendment 59. *See* National Marine Fisheries Service, Amendment 59 to the Fishery Management Plan for the Snapper-Grouper Fishery of the South Atlantic Region (May 15, 2025) ("Amendment 59"), *available at* https://www.fisheries.noaa.gov/s3/2025-06/SG-Am.-59-Secretarial-Amendment-Red-snapper_May-15-2025_Final.pdf. The final rule for Amendment 59 was published on June 11, 2025. *See* 90 Fed. Reg. 24,527.

91.    Amendment 59 was based on an updated stock assessment for South Atlantic red snapper. *See* National Marine Fisheries Service, Stock Assessment of Red Snapper off the Southeastern United States: Update of SEDAR73 Assessment (Dec. 2024) ("SEDAR 73

Update"), *available at* https://sedarweb.org/documents/sefsc-2024-update-to-sedar-73-south-atlantic-red-snapper-assessment.

92.    SEDAR 73 Update is the most recent stock assessment for South Atlantic red snapper. It was deemed by NMFS to be the best scientific information available. *See* Amendment 59 at H-1; 90 Fed. Reg. at 24,532.

93.    SEDAR 73 Update showed South Atlantic red snapper to be, yet again, subject to overfishing. *See* SEDAR 73 Update at 8; Amendment 59 at S-1; 90 Fed. Reg. at 24,528. And yet again, the vast majority of fishing mortality was from dead discards. *See id.* ("The primary driver of overfishing remains general recreational discards."); Amendment 59 at S-1 ("Red snapper overfishing is primarily attributed to dead discards in the recreational sector . . . ."); 90 Fed. Reg. at 24,528 ("Most of the red snapper fishing mortality is attributed to dead discards in the recreational sector.").

94.    In response to SEDAR 73 Update, NMFS in Amendment 59 simply changed the reference point that defines overfishing. Specifically, NMFS raised the proxy for $F_{MSY}$—the fishing rate at maximum sustainable yield—to a value that happened to match precisely the most recent level of fishing mortality over the past three years. *See id.* at 24,529 (explaining that the new $F_{MSY}$ proxy "would be $F_{2021-2023}$ [i.e., the level of fishing mortality that occurred during the years 2021–2023], and the red snapper stock would no longer be classified as undergoing overfishing ($F_{CURRENT}/F_{2021-2023} = 1.0$).").

95.    So rather than make actual changes on the water to end overfishing, NMFS simply erased a number on paper and replaced it with a different one. Problem solved.

96.    Having removed any reason that might compel actual management changes, NMFS proceeded in Amendment 59 to essentially continue the status quo. The agency set an

annual catch limit in landings-only units for the commercial and recreational sectors, along with measures to ensure accountability to those landings-only annual catch limits. *See id.* ("[T]his final rule specifies a commercial [annual catch limit] of 102,951 lb (46,698 kg), and a recreational ACL of 22,797 fish (equivalent to 263,815 lb (119,664 kg)). . . . These landed [annual catch limit] values . . . assume no additional reduction in dead discards is achieved. Management measures such as the current commercial and recreational fishing seasons and the commercial trip limit and recreational bag limit are intended to constrain catches to the sector [annual catch limits].").

97.    The landings-only annual catch limits in Amendment 59 were decreased slightly from the previous values established in Amendment 43 (and the 2024 temporary rule), reflecting the overall increasing trend in dead discards. The commercial sector received a 75-pound trip limit, which is the same as previous years, but its landings limit was decreased by around 20,000 pounds. *Id.* at 24,530. This means the commercial season is expected to close earlier this year than in previous years.

98.    Amendment 59 also purported to establish a "total [annual catch limit]," comprised of both landings and dead discards. *See id.* at 24, 529 (stating that NMFS is setting a "total [annual catch limit] of 509,000 fish," and explaining that "the total [annual catch limit] of 509,000 fish represents both landed catch (34,000 fish) and dead discards (475,000 fish)").

99.    The existence of this "total [annual catch limit]" was asserted in preamble language in the Amendment 59 rulemaking. *See id.* (final rule); 90 Fed. Reg. 3160, 3164 (Jan. 14, 2025) (proposed rule). It appears nowhere in the regulatory text, however, either as proposed or implemented in the final rule. *See id.* at 3168–70 (proposed rule); 90 Fed. Reg. at 24,539–39 (final rule).

100.    Similarly, there are no measures provided in Amendment 59 that serve to create accountability to this "total [annual catch limit]."  Nothing whatsoever in the agency's regulations—either pre-existing provisions in the Code of Federal Regulations or new provisions implemented through Amendment 59—has the function of constraining catch to the numerical value that NMFS asserts is a "total [annual catch limit]" for South Atlantic red snapper.

101.    By contrast, there are measures that serve to constrain *landings* to the landings-only limits provided for the commercial and recreational sectors. *See id.*; 50 C.F.R. § 622.193(y).

102.    When Plaintiffs pointed out during public comment that NMFS's so-called "total [annual catch limit]" did not function as a limit, and did not have measures to ensure accountability, the agency responded in the final rule with word salad. *See* 90 Fed. Reg. at 24,535 (response to Comment 17).

103.    So four years after SEDAR 73, after an incomplete regulatory amendment by the Council, a new stock assessment, and a Secretarial Amendment with much fanfare, there remains no accountability for dead discards of red snapper. The commercial sector is still paying the bills for the recreational sector, commercial landings have been cut yet again, and NMFS is just kicking the can down the road.


**FIRST CLAIM FOR RELIEF:**
**DEFENDANTS HAVE FAILED TO ESTABLISH A LIMIT ON THE ANNUAL CATCH OF SOUTH ATLANTIC RED SNAPPER, WITH MEASURES TO ENSURE ACCOUNTABILITY TO THAT LIMIT, AS REQUIRED BY 16 U.S.C § 1853(a)(15)**

104.    Plaintiffs re-allege and incorporate by reference the allegations contained in all preceding paragraphs of this Complaint.

105.    The Magnuson-Stevens Act requires NMFS to "establish a mechanism for specifying annual catch limits . . . at a level such that overfishing does not occur in the fishery, including measures to ensure accountability." 16 U.S.C. § 1853(a)(15).

106.    Congress intended the word "catch" in 16 U.S.C. § 1853(a)(15) to include both landings and dead discards.

107.    Congress intended the word "limit" in 16 U.S.C. § 1853(a)(15) to have its ordinary meaning as a value not to be exceeded.

108.    In 16 U.S.C. § 1853(a)(15), Congress intended the mandatory "measures to ensure accountability" to provide accountability to the "limit" that is established for "catch."

109.    Accountability measures and catch limits are twinned requirements in 16 U.S.C. § 1853(a)(15) for a reason. A limit is only a limit if there is accountability to the limit; otherwise it is merely a recommendation, goal, or other type of soft number.  And accountability is only meaningful with respect to a specific limit; you cannot create accountability in the abstract, without a specific point where accountability kicks in.

110.    The Amendment 59 Final Rule provides limits on landings of red snapper—with measures to ensure accountability—for both the commercial and recreational sectors. These limits, however, do not included dead discards. As a result, they are not limits on "catch," per 16 U.S.C. § 1853(a)(15). They are simply limits on landings, which in this case only represents around 10% of catch. The other 90% of red snapper catch is in the form of dead discards.

111.    The Amendment 59 Final Rule provides an ostensible "total [annual catch limit]" for red snapper, but that number does not function as a limit and it lacks corresponding accountability measures.  As a result, it is not a "limit" and there are no "measures to ensure accountability," per 16 U.S.C. § 1853(a)(15). It is simply a number on paper, with no regulatory

effect and no statutory significance; the catch of red snapper is in no way limited or constrained to this number.

112.    The Amendment 59 Final Rule therefore violates the statutory requirement to "establish a mechanism for specifying annual catch limits . . . at a level such that overfishing does not occur in the fishery, including measures to ensure accountability." 16 U.S.C. § 1853(a)(15).

113.    Because the Amendment 59 Final Rule violates the substantive requirements in the Magnuson-Stevens Act, it also violates the APA. *See* 5 U.S.C. § 706(2)(A).

114.    The Amendment 59 Final Rule was published on June 11, 2025.

115.    This complaint was filed within 30 days of publication of the Amendment 59 Final Rule, and pursuant to 16 U.S.C. § 1855(f), the Amendment 59 Final Rule is properly subject to judicial review.

116.    Commercial fishermen including Plaintiffs have suffered for years now under increasingly restrictive trip limits for red snapper, of which the Amendment 59 Final Rule is the most recent iteration. The restrictive trip limits are a direct consequence of NMFS failing to provide accountability for dead discards, as explained above in Paragraphs 18–28.

117.    Commercial fishing has been increasingly marginalized in the South Atlantic region, and many snapper-grouper fishermen, buyers, and processors—including Plaintiffs—are barely getting by. Remedial action in the form of an order compelling NMFS establish an actual "limit" on the "catch" of South Atlantic red snapper would help Plaintiffs and other commercial fishermen stay economically viable, as explained above in Paragraphs 29–33.

118.    For these reasons, Defendants have violated the Magnuson-Stevens Act and the APA, and their legal violations have harmed and will continue to harm Plaintiffs until they are remedied by this Court.


**SECOND CLAIM FOR RELIEF:**
**DEFENDANTS HAVE CONDUCTED A DE FACTO REALLOCATION IN VIOLATION OF 16 U.S.C. § 1851(a)(4) AND 16 U.S.C. § 1853(a)(14) BY FAILING TO LIMIT RECREATIONAL DISCARDS OF SOUTH ATLANTIC RED SNAPPER**

119.    Plaintiffs re-allege and incorporate by reference the allegations contained in all preceding paragraphs of this Complaint.

120.    National Standard 4 of the Magnuson-Stevens Act requires that "[i]f it becomes necessary to allocate or assign fishing privileges among various United States fishermen, such allocation shall be (A) fair and equitable to all such fishermen; [and] (B) reasonably calculated to promote conservation . . . ." 16 U.S.C. § 1851(a)(4).

121.    The Magnuson-Stevens Act further requires fishery management plans for all rebuilding stocks to "allocate, taking into consideration the economic impact of the harvest restrictions or recovery benefits on the fishery participants in each sector, any harvest restrictions or recovery benefits fairly and equitably among the commercial, recreational, and charter fishing sectors in the fishery." 16 U.S.C. § 1853(a)(14); *see also id.* § 1854(e)(4)(B) (same).

122.    NMFS has provided its interpretation of National Standard 4 and the associated allocation requirements in the Act in regulatory guidelines. *See* 50 C.F.R. § 600.325. The agency's guidelines explain that fishery management plans should describe and analyze all fishery allocations, *id.* § 600.325(c)(2), as well as ensure that allocations comply with the substantive requirements provided in National Standard 4 and the rebuilding provisions, *id.* § 600.325(c)(3).

123.    In 2012, NMFS approved the currently governing allocation ratio for red snapper, which is 28.07 percent commercial and 71.93 percent recreational. *See* Amendment 25 at 53; 77 Fed. Reg. at 15,924.

124.    Allowing unlimited and unaccountable dead discards has drastically inflated the share of South Atlantic red snapper actually taken by the recreational sector in the decade or more since the allocation ratio was adopted. The reasons for this are described in more detail in paragraphs 18–28 above.

125.    The inflation of recreational catch has occurred over a time period in which commercial catch has remained relatively stable, resulting in a de facto reallocation of South Atlantic red snapper.

126.    Neither NMFS nor the South Atlantic Council has acknowledged this reallocation, much less provided the analysis or deliberative consideration required by the Magnuson-Stevens Act.

127.    The reallocation furthermore fails to comply with the substantive requirements of National Standard 4 (and the related rebuilding provisions of the Act), because it is not fair nor equitable, nor is it reasonably calculated to promote conservation.

128.    The de facto reallocation that NMFS has furthered, under the Amendment 59 Final Rule, has harmed commercial fishermen and buyers, including Plaintiffs, because it has dramatically reduced their share of catch of red snapper relative to the approved allocation ratio of 28.07 percent commercial and 71.93 percent recreational.

129.    Commercial fishermen and buyers including Plaintiffs have struggled under the current low commercial trip limits for red snapper, which, as just noted, represent a continuously

declining share of the total catch of South Atlantic red snapper due to unaccountable and ever-increasing recreational dead discards.

130.    Absent this de facto reallocation, commercial fishermen would be entitled to significantly more catch of red snapper, given the stock's growth in abundance and biomass in recent years. This lost revenue has led to deferred investments in infrastructure and maintenance across the whole commercial sector, including Plaintiffs, and has otherwise diminished Plaintiffs' ability to prosecute their business operations. These harms are discussed further in paragraphs 29–33 above.

131.    Plaintiffs reasonably expect that if and when this illegal de facto reallocation is remedied, commercial trip limits will go up, leading to increased revenues for themselves and other commercial fishermen and buyers. These increased revenues in turn will help Plaintiffs and other commercial fishermen and buyers stay economically viable, given the narrow margins within which they operate.

132.    For these reasons, Defendants have violated the Magnuson-Stevens Act and the APA, and the legal violations have harmed and will continue to harm Plaintiffs until they are remedied by this Court.

**PRAYER FOR RELIEF**

For the foregoing reasons, Plaintiffs respectfully request that this Court:

1.    Declare that Defendants violated the Magnuson-Stevens Act and the APA as described above when they promulgated the Amendment 59 Final Rule;

2.    Vacate and set aside the Amendment 59 Final Rule;

3.      Order and enjoin Defendants to, by a date certain, establish a legally adequate annual catch limit for South Atlantic red snapper that actually functions as a limit on both discarded and landed catch, has measures to ensure accountability with the limit, and reflects the relevant allocation ratio between the commercial and recreational sectors;

4.      Maintain jurisdiction over this action until Defendants are in compliance with the Magnuson-Stevens Act and the APA, and every order of this Court;

5.      Award Plaintiffs their reasonable attorneys' fees and costs pursuant to 28 U.S.C. § 2412; and

6.      Provide Plaintiffs such additional and further relief as may be appropriate.


Dated:  July 3, 2025                        Respectfully submitted,

                                            /s/ Seth Atkinson_____
                                            Seth L. Atkinson (Bar ID CA00190)
                                            Quillback Consulting
                                            348 Nobel Drive
                                            Santa Cruz, CA 95060
                                            (203) 331-2792
                                            seth@quillbackconsulting.com

                                            *Attorney for Plaintiffs*